OPINION
{¶ 1} Defendant-appellant Steven Smith ("Smith") brings this appeal from the judgment of the Court of Common Pleas of Union County, convicting him of one count of trafficking in marijuana.
 {¶ 2} On April 18, 2001, a search warrant was executed at Smith's apartment. The police located a glass pipe, 1.3 grams of marijuana, $500 in cash, one empty plastic baggie, one empty plastic baggie with the name Travis on it, a piece of paper with four names and numbers marked out, hand scales, and a loaded gun in Smith's bedroom. At the time of the search there were four people in the apartment, but Smith was not present. Two of these people were juveniles. On June 8, 2001, Smith was indicted on one count of trafficking in marijuana in violation of R.C.2925.03(A)(2). The indictment also alleged that the offense was committed in the vicinity of a juvenile in violation of R.C.2925.03(C)(3)(b). A trial was held on August 24, 2001.
 {¶ 3} At the trial, one of the juveniles testified that she was present when the search warrant was executed. She also testified that she had never purchased or received any marijuana from Smith. She did not testify that she was present at any other time. The apartment manager testified that Smith had more visitors than the average tenant. She testified that Smith usually had two carloads of visitors each day who would come and stay for a couple of hours before leaving. After each witness had testified on direct and cross-examination, jurors were permitted to submit questions to the judge and the questions were then asked to the still seated witnesses. One of the questions asked was who owned the gun and the jury was informed that the gun was stolen. A juror also asked how much marijuana could be purchased with the $500.00 in cash found in Smith's bedroom. The officer answered that a dime bag, which is the amount actually found in Smith's room, would sell for around $20.00, so $500.00 would supply several bags worth. In closing, the State argued that it was not trying to prove that Smith was selling marijuana as that was not what the charge was. However the State then argued that Smith must have been selling or he wouldn't have had the scales, the baggies, the cash, or the gun in his room. The State also claimed that the paper with the names and numbers written on it was a list of debtors and the amounts of money they owed to Smith for drugs purchased from him. The jury found Smith guilty of the offense charged and found that the offense was committed in the vicinity of a juvenile. On August 30, 2001, a sentencing hearing was held and Smith was sentenced to seventeen months in prison. It is from this judgment that Smith appeals.
 {¶ 4} Smith raises the following assignments of error.
 {¶ 5} "The trial court improperly charged the jury relative to the interpretation of circumstantial evidence and failed to instruct as to inferences to the prejudice of [Smith].
 {¶ 6} "The trial court erred in admitting State's Exhibit Six to the prejudice of [Smith].
 {¶ 7} "The trial court's verdict of guilty was against the manifest weight of the evidence and without sufficiency of evidence beyond a reasonable doubt for a finding of guilty."
 {¶ 8} The first assignment of error claims that the trial court gave incorrect jury instructions. The record reveals that no objection was made to the jury instructions at trial and no proffer of the "proper" jury instructions was made. "On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30. Failure to object before the jury retires constitutes a waiver of the objection absent plain error. State v. Williford (1990), 49 Ohio St.3d 247, 551 N.E.2d 1279. "The plain error rule should not be invoked unless, but for the error, the outcome of the trial would clearly have been otherwise." Id. at 252, 551 N.E.2d at 1284.
 {¶ 9} Here, the instruction given by the trial court was erroneous. The trial court's instruction did not give equal value to direct and circumstantial evidence. Instead, the trial court increased the burden of proof for the State on the circumstantial evidence.
 {¶ 10} "Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence. Hence, we can discern no reason to continue the requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. We agree with those courts that have held that an additional instruction on the sufficiency of circumstantial evidence invites confusion and is unwarranted. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function in concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial against the standard of proof beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, 272, 574 N.E.2d 492.
 {¶ 11} The trial court's instructions to the jury mirrored those used prior to the Jenks ruling. Thus, any prejudice resulting from the instructions was against the State. As a result, any error would be harmless to Smith.
 {¶ 12} Smith also claims that the trial court erred by not instructing the jury on the proper use of inferences. The trial court did not give any instruction on the use of inferences. However, Smith did not object to the failure to so instruct the jury. It is not clear that the jury's decision would have been different had they received that instruction. Thus, we cannot find this failure to be plain error. The first assignment of error is overruled.
 {¶ 13} The second assignment of error alleges that the trial court erred by receiving into evidence the list of names and numbers. This paper contained four names with numbers after the names. The State had an officer identify the paper as being found near the "dime bag" of marijuana in the nightstand. The paper was admitted over objection because the State claimed that the paper was not being offered to prove the truth of the matter stated, so it was not hearsay. Smith's attorney then claimed that if the paper was not offered to prove the truth of the matter stated, it was irrelevant. The trial court agreed, but permitted the paper to be admitted anyway. Tr. 98. After the paper was admitted, Smith explained during his testimony that the paper was a list of money owed to him by friends for money he had lent to them at various times. This explanation was confirmed by another witness who testified that Smith kept track of loans in that manner and that he owed Smith the money on the list because Smith had leant him $400 to buy speakers a few years before. The State argued in closing that the numbers on the list were debts owed by the named parties to Smith for the purchase of drugs.
 {¶ 14} At trial, Smith made two objections to the admission of the paper. The first was that the paper was hearsay. The trial court overruled this objection because the State claimed that it was not offering it to prove the truth of the matter stated. The evidence does not indicate that the State ever did try to prove that those people owed those exact amounts. However, the State did argue that the paper was a record of the amounts owed, which had the effect of offering the paper to prove the truth of the matter stated on it. This would make the paper a statement made outside of court that would require some foundation to show why it would not be hearsay. However, the state claimed it was not offering the paper for the purpose of proving the truth of the matter stated and the trial court agreed. That is within the sound discretion of the trial court and we will not overrule it. Thus, the hearsay objection was properly overruled.
 {¶ 15} The second objection was that the paper was irrelevant. The trial court agreed, but permitted the admission anyway. Tr. 98. Evidence that is not relevant is not admissible. Evid.R. 402. During its case in chief, the State presented no evidence showing any connection between the offense charged and the paper. The only testimony concerning the paper was that it was found in the nightstand drawer along with the "dime bag" of marijuana and the cash. The fact that a paper is found in the same container with other relevant evidence does not automatically make it relevant. Without some showing of relevance, the State's motion to admit the paper at the close of its case-in-chief should have been overruled and the paper should have been excluded as irrelevant. The State cannot base the relevancy of a piece of evidence on testimony given by the defendant because if it had not already been admitted, then the defendant would not have needed to address it. Since the trial court found the evidence to be irrelevant, it erred by admitting it. The second assignment of error is sustained.
 {¶ 16} In the third assignment of error, Smith claims that the verdict is not supported by the evidence.
 {¶ 17} "Weight of the evidence concerns `the inclination of thegreater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find thegreater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'" State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541.
 {¶ 18} Here, the State had to prove that Smith 1) knowingly, 2) prepared for distribution, 3) a controlled substance, 4) knowing that the controlled substance was intended for sale or resale by the offender or another person. R.C. 2925.03. The State also had to prove that the crime charged was committed within 100 feet of a juvenile. We will deal with the evidence concerning the vicinity of a juvenile first. The State presented evidence that two juveniles were present in the residence at the time the search warrant was executed. However, Smith was not shown to have been committing any crime at that time and he was not even present at the residence. Evidence that a juvenile was present during execution of a search warrant is not evidence that a juvenile was in the vicinity during the commission of any offense unless the offense was being committed at the same time that the search warrant was executed. Since there is no evidence that shows juveniles were in the vicinity at the time of commission of the offense charged, a finding of guilt of this specification is against the manifest weight of the evidence.
 {¶ 19} Next, we address the evidence supporting the conviction for trafficking in drugs. Throughout the trial the State admitted that it was not trying to prove that Smith sold drugs to anyone. However, the State frequently argued that Smith must have been selling drugs. The State claimed that this could be inferred from the number of visitors each day, the scales found in the bedroom, the baggies in the bedroom, and the list of names with the numbers following them. The State also argued that the reason Smith needed a gun was to protect himself from people who wanted to rob him because he was dealing drugs. The State's theory of the case was that Smith was getting drugs from his supplier in Columbus, repackaging the drugs and then selling them to the people who came to his house.
 {¶ 20} Countering this theory is the fact that only 1.3 grams of marijuana were found in the house. Smith testified that he had purchased this marijuana for his personal use. The officers testified that the amount found in the bedroom was a "dime bag" and was consistent with the amount normally found for personal use. There was no evidence that any other drugs had ever been in the house. The two baggies that were seized pursuant to the search warrant were empty. Testimony was given that the baggies were clean so no tests for drug residue were performed on the baggies. Smith then provided explanations for the number of visitors to his house and for the physical evidence seized there.
 {¶ 21} Included in the evidence before the jury were several items that were not relevant or admissible. As discussed above, the paper containing the names and numbers should not have been admitted. Another inadmissible item was the testimony that the gun was stolen. In response to a juror's question, one of the officers testified that the loaded gun found in Smith's room was stolen. Since the charge did not have anything to do with the gun or its theft, the ownership of the gun was irrelevant and the statement that it was stolen was overly prejudicial to the defendant as it implied that he had committed another earlier crime.[1]
Another juror asked why the police had searched Smith's home. In response, an officer testified that a confidential informant had notified the police that Smith was dealing drugs. The trial court correctly excluded the search warrant as hearsay, but permitted the officers to testify about the contents of the search warrant. Doing so permitted the jury to hear a highly prejudicial hearsay statement that was not made under oath and was not subject to cross-examination. That evidence should not have been placed before the jury and should not have been considered.
 {¶ 22} Once we exclude the evidence that was improperly before the jury, the remaining evidence is that the police located a "dime bag" of marijuana, cash, and two empty baggies in a nightstand drawer and that a loaded gun and a hand scale were also found in the bedroom. Other testimony includes the admission by Smith that the marijuana found in the room was purchased for his personal use from some guy in Columbus that he thinks is named John.[2] There is no evidence that any other amount of drugs was ever present at the house at all. The State's argument that since there was $500.00 in cash in the room, the other drugs must have already been sold is not evidence that the drugs were ever there or that the money was proceeds of drug sales. Having cash in the house is not indicative that illegal activities have occurred.[3] Although it is not necessary to have the drugs present in the residence at the time of the search warrant to find Smith guilty of trafficking, there must be some evidence that he had a sufficient quantity of drugs to package or distribute or that he had done so at some time. Given this evidence, a conviction is not a clear outcome. However, this court is not willing to say that a reasonable person could not find Smith guilty of trafficking in marijuana. Thus, the third assignment of error is sustained in part and overruled in part.
 {¶ 23} While reviewing the record, the matter of the jury questions raised several questions with this court. This court has previously held that it is error to permit the jury to ask questions of witnesses at trial where such questioning is prejudicial to the rights of a defendant. State v. Cobb (July 24, 2000), Seneca App. No. 13-2000-7, unreported. In this case, the following dialogues occurred as a result of jury questions. The trial court told the jury of the procedure that would be used as follows:
 {¶ 24} "The Court: Oh. Oh. Oh. That's right. You have any question for Mr. Coutts, now is the time to write it down. Write them down. I ask you to pass them to what would be your left. And if you have no question, just write, no question, and pass it to your left." Tr. 86. The first witness questioned was Officer Coutts.
 {¶ 25} "The Court: Mr. Coutts, Mr. Coutts, if you would resume the witness stand. To your personal knowledge, was anyone who was present there at the time the search was made, did they exhibit any signs of being on drugs?
 {¶ 26} "The Witness: Not that I recall. I know that there's one individual that took off towards the kitchen to get rid of some Schedule II Adderall, which is basically along the lines of Ritalin, but to say someone was actually on drugs at that point in time, I can't recall." Tr. 86-87.
 {¶ 27} The next witness of concern was Patrolman Craig Nicol.
 {¶ 28} "The Court: Officer, do you know what the approximate volume of $500 worth of marijuana would be at street prices?
 {¶ 29} "The Witness: Not offhand.
 {¶ 30} "The Court: When you total up the numbers on the, on the Exhibit Six, what does the total come to?
 {¶ 31} "The Witness: I would have to look at the exhibit, but a lot of the numbers are —
 {¶ 32} "Mr. Probst: Can I approach with the exhibit?
 {¶ 33} "The Court: Sure, show him the exhibit.
 {¶ 34} "Mr. Probst: I'm going to rehand you State's Exhibit Number Six for identification purposes.
 {¶ 35} "The Witness: Okay. The amount that's not crossed out equals $185. There are amounts next to a couple of the names that appear to start about, next to Travis, it appears to be either 80 or a 50. That's crossed out, then a 30 next to it. Next to Andy, I can't, I can't read that. Then there's a John. Next to the John there's a 35 crossed out, and then a 55 is n3ext to it that's not crossed out. Then there's three other numbers I can't read that are, have been crossed out.
 {¶ 36} "The Court: All right. Who was the first officer in the bedroom?
 {¶ 37} "The Witness: Patrolman Sean Finney was the initial officer in the bedroom.
 {¶ 38} "The Court: How do you know which bedroom is Mr. Smith's.
 {¶ 39} "The Witness: I observed a checkbook on the nightstand directly in the area of the baggie of marijuana and the tin that had Mr. Smith's name on it.
 {¶ 40} "* * *
 {¶ 41} "The Court: Had you been observing Mr. Smith prior to the search?
 {¶ 42} "The Witness: I had not, no.
 {¶ 43} "The Court: Well, do you know what led you to investigate that particular apartment?
 {¶ 44} "The Witness: I believe on the search warrant it contained that they had confidential informant that had led them to that apartment, also with the statements made by the landlord of a lot of traffic going in and out of that apartment, more than the normal amount would go into an apartment.
 {¶ 45} "The Court: All right. Was the ownership of the gun that was taken during the search, was that determined?
 {¶ 46} "The Witness: The determination of the gun itself, I observed a report from the Bureau of Alcohol, Tobacco and Firearms. It was found to be a stolen gun, but it was in the, under the mattress in the same bedroom as the defendant.
 {¶ 47} "The Court: All right. Based upon the questions that I've asked, does the State have any further questions of this witness?
 {¶ 48} "Mr. Probst: Just a few brief ones, you Honor. Patrolman Nicol, you were asked the question about the amount of marijuana that would be $500 worth at street value, if I heard correctly. Are you familiar with the street price of marijuana at all?
 {¶ 49} "The Witness: No, I'm not.
 {¶ 50} "Mr. Probst: Okay. Thank you.
 {¶ 51} "The Court: Does the defendant have any questions based on the questions I've asked?
 {¶ 52} "Mr. Parsons: Just one. Thank you. Patrolman, my client wasn't charged with anything about stealing the gun. Correct?
 {¶ 53} "The Witness: That's correct." Tr. 112-115.
 {¶ 54} Jury questions addressed to Officer Glenn Nicol also raise concerns.
 {¶ 55} "The Court: Officer, outside of the amount of traffic, was there any other reason to be searching the apartment, that particular apartment?
 {¶ 56} "The Witness: Outside of the amount?
 {¶ 57} "The Court: Amount of traffic.
 {¶ 58} "The Witness: Yes, there was.
 {¶ 59} "The Court: All right. And I guess the follow-up question would be, what would be that reason?
 {¶ 60} "The Witness: There is a couple of reasons listed in the warrant to search, or in the affidavit for the warrant to search, as I recall at this time. A couple of those reasons is — one was, one was a confidential source or informant about the trafficking there, also the confidential informant — also outside, the traffic. The traffic. That was one of the main reasons. And also, the people that we knew to be residing there, had been inside the apartment, and their past record, and our dealings with them.
 {¶ 61} "The Court: All right. As an expert in identifying and investigating marijuana cases, what would be the volume of $500 worth of marijuana at street value?
 {¶ 62} "The Witness: It depends a lot on how it is broken down and sold individually. Five hundred dollars could get up to a quarter-pound easily of marijuana in one setting. It also could be broken down to where you sell like 1.3 grams for $20. If you sold 1.3 grams for $20, without doing the math in my head real quick, it could be a sizable quantity of bags. In other words, if you broke down 1.3 grams, which is a small amount, and sole them all for $20 out of the bag, you would really increase the number of sales as just buying one lump sum, a quarter-pound, for $500.
 {¶ 63} "The Court: Well, then, are you saying that the 1.3 grams that you were talking about, that that could be broken down into salable amounts for like $20 apiece?
 {¶ 64} "The Witness: I guess to clarify, if you were to buy approximately 1.3 grams, which would commonly be referred to as like a dime bag, you could charge easily $20 for that, and say out of $500, you could actually get five for a hundred dollars, so about 25 sales of that increment for $500, or just one lump sum of a quarter pound, which would be a — the quarter-pound would be sizably more marijuana.
 {¶ 65} "The Court: Does the State have any questions based upon the questions that I asked?
 {¶ 66} "Mr. Probst? No questions, you Honor.
 {¶ 67} "The Court: Does the defense have any question based on the questions I have asked?
 {¶ 68} "Mr. Parsons: I just wanted to clarify your Honor. Officer Nicol, you testified, I believe your testimony was, one of the reasons you went into this residence was the past history of the people that lived there. Is that correct?
 {¶ 69} "The Witness: That were residing there.
 {¶ 70} "Mr. Parsons: Have you ever had any contact with my client?
 {¶ 71} "The Witness: No, I have not.
 {¶ 72} "Mr. Parsons: And did anybody else that took part in the search warrant have any contact with my client, to your knowledge?
 {¶ 73} "The Witness: To my knowledge, I'm not aware of their contact with him prior to this.
 {¶ 74} "Mr. Parsons: Thank you. That's all I have your Honor.
 {¶ 75} "The Court: Any redirect?
 {¶ 76} "Mr. Probst: Officer Nicol, are you familiar with the street values of marijuana?
 {¶ 77} "The Witness: Yes, I am.
 {¶ 78} "Mr. Probst: Are you familiar — how long have you lived in Marysville, Union County, Ohio?
 {¶ 79} "The Witness: All my life, 40 years.
 {¶ 80} "Mr. Probst: What type of investigation in Marysville have you done regarding street sale of marijuana?
 {¶ 81} "The Witness: I've been involved in approximately 300 sales and trafficking cases during my career, not including just possession cases.
 {¶ 82} "Mr. Probst: What's the most common weights of marijuana sold on the street in Marysville?
 {¶ 83} "The Witness: Again depending on the level of the dealer and the level of the buyers, as far as what they can afford, and what they're dealing with, usually the younger generation will deal mostly with the smaller amounts that's just for persona use, such as we're talking about 1.3 grams, which is a dime bag. Commonly sold around here are the quarter ounces, and the half-ounces, or eighth of an ounce. Those amounts range anywhere from $40 to $60 for a quarter-ounce." Tr. 138-142.
 {¶ 84} A review of the testimony in response to juror questions discloses the admission of a great deal of irrelevant and prejudicial testimony. Since the jury questions resulted in the admission of overly prejudicial testimony, we find that it was plain error for the trial court to permit it. As set forth in Cobb, this court does not endorse the practice of having jurors ask questions of witnesses, but will not reverse a case where this practice has occurred absent a showing of prejudice. This court has also addressed the issue of jury questions in State v. York (Mar. 28, 2002), Seneca App. No. 13-01-19, unreported. However, we need not address the decision reached by the majority in York because prejudice resulted from the questions of the jury in this case. The prejudice of the jury's questions in this case is clear from a reading of the record. Thus, the trial court abused its discretion in permitting the jury questions. For this reason, the judgment of the Court of Common Pleas of Union County is reversed and the case is remanded for further proceedings.
Judgment reversed and cause remanded.
 HADLEY, J., concurs.
SHAW, P.J., concurs separately.
[1] As of the time of trial no charges concerning the stolen gun had been brought.
[2] The State argued that the fact that Smith did not know the full name of his supplier in Columbus shows that he was buying large quantities of drugs and is lying. However, this conclusion is not the only reasonable one available. Drug dealers may not give their customers their full names or even their real names.
[3] The record reveals that Smith was gainfully employed so had another source of possible income.